**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ANGUS CHOI, derivatively on behalf of PLURALSIGHT, INC.<br><br>          Plaintiff,<br><br>   v.<br><br>AARON SKONNARD, JAMES BUDGE, GARY CRITTENDEN, SCOTT DORSEY, KARENANN TERRELL, BONITA STEWART, BRADLEY RENCHER, ARNE DUNCAN, LEAH JOHNSON, TIM MAUDLIN, FREDERICK ONION, and RYAN HINKLE,<br><br>          Defendants,<br><br>   and<br><br>PLURALSIGHT, INC.,<br><br>          Nominal Defendant. | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL<br><br> Case No. |

Plaintiff Angus Choi ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of nominal defendant Pluralsight, Inc. ("Pluralsight" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) as officers and/or directors of Pluralsight for breaches of fiduciary duty, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations, based upon investigation by counsel, including, but not limited to, a review and analysis of:  (i) regulatory filings made by Pluralsight with the U.S. Securities and Exchange Commission (the "SEC"); (ii) press releases issued and disseminated by Pluralsight;

(iii) a purported securities class action lawsuit filed in the United Stated District Court for the Southern District of New York, entitled *City of Birmingham Firemen's and Policemen's Supplemental Pension System v. Pluralsight, Inc.*, Case 1:19-cv-07563 (S.D.N.Y.) (the "Securities Class Action"), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; and (iv) other publicly-available information, including media and analyst reports, concerning Pluralsight.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a stockholder derivative action that seeks to remedy wrongdoing committed by certain of Pluralsight's officers and members of the Company's Board of Directors (the "Board") and their affiliates.  Plaintiff seeks to remedy Defendants' violations of state and federal laws from August 2, 2018 through July 31, 2019 (the "Relevant Period") that have caused and continue to cause substantial monetary damages to Pluralsight and other damages, including damages to its reputation and goodwill.

2.    Pluralsight provides cloud-based and video training courses for software developers, IT administrators, and creative professionals.  The Company went public through its Initial Public Offering ("IPO") in May 2018, selling 23.8 million shares at $15 per share.  The IPO raised approximately $357 million.  The Company engaged in a secondary public offering ("SPO") in March 2019, selling 15.6 million shares at $29.25 per share for proceeds of over $450 million. The SPO resulted in the insiders and the related parties cashing out their investment while the price of Pluralsight's common stock was artificially inflated due to the Individual Defendants' misrepresentations and omissions.

3.    During the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to

investors that:  (i) Pluralsight was experiencing sales execution challenges which impacted its billings; (ii) Pluralsight was experiencing substantial delays in hiring and properly training its salesforce to meet its optimistic billing projections; and (iii) Pluralsight was behind on the onboarding of new sales representatives, which was causing sales execution issues and preventing the Company from meeting its high growth projections.  The Individual Defendants intentionally obscured and omitted this information from the public investors, so they could cash out in the SPO and separately in the open market.

4.      On July 31, 2019, after the markets closed, the Individual Defendants announced disappointing financial results for the second quarter of fiscal 2019.  The Individual Defendants were forced to disclose that the Company's billings growth rate had sharply deteriorated from over 40% to just 23% year-over-year.  The Individual Defendants blamed the Company's declining growth in billings on sales execution challenges and other salesforce related issues.  The Company also disclosed that its Chief Revenue Officer was resigning.  On this news, the Company's stock price plummeted nearly 40% on unusually heavy trading volume the next day.

5.      Finally, during the Relevant Period, the Director Defendants negligently issued a materially false and misleading proxy statement urging stockholders to reelect certain of the Director Defendants under false pretenses.

6.      As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Pluralsight has sustained damages as described below.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

8.      Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

9.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Pluralsight is incorporated in this District.  In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

12.     Plaintiff is a current stockholder of Pluralsight common stock.  Plaintiff has continuously held Pluralsight common stock at least since September 2017.  Plaintiff is a citizen of Massachusetts.

13.     Pluralsight is a Delaware corporation with its principal executive offices at 182 North Union Avenue, Farmington, Utah 84025.  Pluralsight's Common stock shares trade on the Nasdaq Global Select market ("NasdaqGS") under the ticker symbol "PS."

14.     Defendant Aaron Skonnard ("Skonnard") co-founded Pluralsight in 2004 and has served as the Company's Chief Executive Officer ("CEO") since October 2009 and as the Board's Chairman since December 2017.  Defendant Skonnard is named as a defendant in the Securities Class Action.  According to the Company's filings with the SEC, defendant Skonnard received $12,951,975 from the Company in compensation in 2018.  During the Relevant Period, defendant Skonnard sold the following shares with insider information regarding Pluralsight's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Pluralsight stock trading at artificially inflated prices at the time of his stock sales:

4

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| November 16, 2018 | 25,000 | $22.14 | $553,417 |
| December 4, 2018 | 400 | $26.03 | $10,412 |
| January 7, 2019 | 74,600 | $26.06 | $1,944,014 |
| January 28, 2019 | 50,000 | $29.36 | $1,468,000 |
| March 11, 2019 | 480,618 | $28.37 | $13,363,334[1] |
| April 26, 2019 | 133,395 | $33.71 | $4,497,075 |
| July 26, 2019 | 84,594 | $30.47 | $2,577,850 |

15.     Defendant James Budge ("Budge") has served as the Company's Chief Financial Officer ("CFO") since April 2017.  Defendant Budge is named as a defendant in the Securities Class Action.  According to the Company's filings with the SEC, defendant Budge received $7,427,500 from the Company in compensation in 2018.  During the Relevant Period, defendant Budge sold the following shares with insider information regarding Pluralsight's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Pluralsight stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| February 19, 2019 | 333,091 | $29.44 | $9,806,297 |
| February 22, 2019 | 6,206 | $29.66 | $184,072 |
| March 11, 2019 | 177,854 | $28.37 | $5,046,163[2] |
| May 22, 2019 | 1,823 | $33.34 | $60,780 |

16.     Defendant Gary Crittenden ("Crittenden") has served as a member of the Board since December 2017.  According to the Company's filings with the SEC, defendant Crittenden received $940,134 from the Company in compensation in 2018.

17.     Defendant Scott Dorsey ("Dorsey") has served as a member of the Board since December 2017.  According to the Company's filings with the SEC, defendant Dorsey received $1,165,265 from the Company in compensation in 2018.

---

[1] This March 11, 2019 sale was pursuant to the SPO.
[2] This March 11, 2019 sale was pursuant to the SPO.

18.     Defendant Karenann Terrell ("Terrell") has served as a member of the Board since December 2017.  Defendant Terrell was also a member of the Company's Audit Committee during the Relevant Period.  According to the Company's filings with the SEC, defendant Thompson received $1,346,200 from the Company in compensation in 2018.  During the Relevant Period, defendant Terrell sold 123,609 shares at $19.88 per share for proceeds of $2,457,346 with insider information regarding Pluralsight's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Pluralsight stock trading at artificially inflated prices at the time of her stock sales.

19.     Defendant Bonita Stewart ("Stewart") has served as a director of the Company's Board since October 2018.  According to the Company's filings with the SEC, defendant Stewart received $220,900 from the Company in compensation in 2018.

20.     Defendant Bradley Rencher ("Rencher") has served as a director of the Board since December 2017.  According to the Company's filings with the SEC, defendant Rencher received $940,134 from the Company in compensation in 2018.  During the Relevant Period, defendant Rencher sold 42,500 shares at $28.37 per share for proceeds of $1,205,831, through the SPO, with insider information regarding Pluralsight's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Pluralsight stock trading at artificially inflated prices at the time of his stock sales.

21.     Defendant Arne Duncan ("Duncan") has been a director of the Board since December 2017.  According to the Company's filings with the SEC, defendant Duncan received $1,514,741 from the Company in compensation in 2018.  During the Relevant Period, defendant Duncan sold 30,000 shares at $28.37 per share for proceeds of $851,175, through the SPO, with insider information regarding Pluralsight's market manipulation, false and misleading statements,

and lack of internal controls, all of which resulted in Pluralsight stock trading at artificially inflated prices at the time of his stock sales.

22.     Defendant Leah Johnson ("Johnson") has been a director of the Board since October 2018.  According to the Company's filings with the SEC, defendant Johnson received $220,900 from the Company in compensation in 2018.

23.     Defendant Tim Maudlin ("Maudlin") has been a director of the Board since December 2017.  Defendant Maudlin served as Chair of the Company's Audit Committee during the Relevant Period.  According to the Company's filings with the SEC, defendant Maudlin received $940,134 from the Company in compensation in 2018.

24.     Defendant Frederick Onion ("Onion") is a co-founder of Pluralsight and has served as a director of the Board since December 2017.  During the Relevant Period, defendant Onion sold the following shares with insider information regarding Pluralsight's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Pluralsight stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| December 14, 2018 | 387,600 | $23.89 | $9,257,826 |
| February 15, 2019 | 30,000 | $30.12 | $903,640 |
| March 11, 2019 | 1,000,000 | $28.37 | $28,372,499[3] |

25.     Defendant Ryan Hinkle ("Hinkle") has been a director of the Board since December 2017.  Defendant Hinkle served as a member of the Company's Audit Committee during the Relevant Period.

26.     Defendants Skonnard and Budge are sometimes referred to herein as the "Securities Class Action Defendants."

---

[3] This March 11, 2019 sale was pursuant to the SPO.

27.     Defendants Skonnard, Crittenden, Dorsey, Terrell, Stewart, Rencher, Duncan, Johnson, Maudlin, Onion, and Hinkle are sometimes referred to herein as the "Director Defendants."

28.     Defendants Skonnard, Budge, Terrell, Rencher, Duncan, and Onion are sometimes referred to herein as the "Insider Selling Defendants."

29.     Defendants Terrell, Maudlin, and Hinkle are sometimes referred to herein as the "Audit Committee Defendants."

30.     Defendants Skonnard, Budge, Crittenden, Dorsey, Terrell, Stewart, Rencher, Duncan, Johnson, Maudlin, Onion, and Hinkle are sometimes referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

33.     In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

34.     To discharge their duties, the officers and directors of Pluralsight were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Pluralsight were required to, among other things:

a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

35.     Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of

herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.     According to the Company's Corporate Governance Guidelines, the Board, and therefore the Director Defendants, is required to "exercise its powers in accordance with its fiduciary duties to the Company and in a manner it reasonably believes to be in the best interests of the Company and its stockholders." Further, the Corporate Governance Guidelines state that the Board must "oversee senior management in the competent and ethical operation of the Company."

37.     The Company also maintains a Code of Business Conduct and Ethics (the "Code"). The Code sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of Pluralsight and its subsidiaries.

38.     According to the Code, the employees and directors of Pluralsight are responsible for helping Pluralsight maintain its good reputation and the trust and confidence of its stockholders, its employees, the public, and those with whom Pluralsight does business.

39.     Pursuant to the Code:

**XII. Compliance with Laws, Rules, and Regulations**

Team members, officers, and directors must comply with all laws, rules, and regulations applicable to our company and our business, as well as applicable Pluralsight policies and procedures. Each team member, officer, and director must acquire appropriate knowledge of the legal requirements relating to his or her duties sufficient to enable him or her to recognize potential problems and to know when to seek advice from the Legal Department. Violations of laws, rules, and regulations may subject the violator to individual criminal or civil liability, as well as to discipline by Pluralsight. These violations may also subject Pluralsight to civil or criminal liability or the loss of business. Any questions as to the

applicability of any law, rule, or regulation should be directed to the Legal Department.

*       *       *

**XVI. Disclosure**

The information in our public communications, including filings with the Securities and Exchange Commission, must be full, fair, accurate, timely, and understandable. All team members, officers, and directors are responsible for acting in furtherance of this policy.  In particular, each team member, officer, and director is responsible for complying with our disclosure controls and procedures and internal controls for financial reporting.

*       *       *

The CEO and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure in any public filings or other public communications made by the Company which contain financial information. Accordingly, it is the responsibility of the CEO and each senior financial officer promptly to bring to the attention of the Company's Audit Committee (the "Audit Committee") any material information of which he or she may become aware that affects the disclosures made by the Company in any public filing or other public communications which contain financial information.

40.     In addition, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities.   The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

41.     Pursuant to the Charter:

The purpose of the Audit Committee (the "Audit Committee") is to assist the Board of Directors (the "Board") of Pluralsight, Inc. (the "Company") in fulfilling its responsibilities for generally overseeing:

•     The Company's accounting and financial reporting processes and internal control over financial reporting, as well as the audit and integrity of the Company's financial statements.

•     The qualifications, independence and performance of the Company's registered public accounting firm (the "independent auditor").

•     The performance of the Company's internal audit function, if any, and independent auditor.

- Risk assessment and risk management associated with the Company's financial reporting, accounting, auditing, tax and cybersecurity matters.

- Compliance by the Company with legal and regulatory requirements.

*     *     *

**Review Financial Statements**.  The Audit Committee shall review and discuss the following with management, the internal auditors, if any, and the independent auditor, as applicable:

- The scope, timing and approach, as well as the materiality thresholds for, the annual audit of the Company's financial statements.

- The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's annual report on Form 10-K. In addition, the Audit Committee shall approve annual and quarterly reports on Form 10-K and 10-Q as well as earnings press releases and related current reports on Form 8-K prior to their filing with the SEC.

- The results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements.

- The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.

- Major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles.

- Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally applicable accounting principles ("GAAP") methods on the financial statements.

- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

- Any significant changes required or taken in the audit plan as a result of any material control deficiency.

- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

- Any significant disagreements between management and the independent auditor.

\*       \*       \*

**Internal Audit.**  The Audit Committee, following the establishment of the Company's internal audit function, if any, shall:

- Review and approve the overall objectives, scope, organizational structure, responsibilities, resources and activities of the internal audit function.

- Review and concur in the appointment or, if applicable, the reassignment or dismissal of the senior internal auditing executive.

- Review and discuss with management and the internal auditors the process used in developing the internal audit plan, the scope of the internal audit plan, significant changes in the planned scope of the internal audit plan and the coordination of the internal audit plan with the independent auditor.

- Review and approve the annual internal audit project plan and any proposed material changes thereto and review periodic reports summarizing results of the internal audit projects including any significant findings.

- Discuss with the independent auditor the responsibilities, budget and staffing of the Company's internal audit function.

- Review and reassess the adequacy of the charter of the Company's internal audit function.

- Review and discuss with the internal auditors the results of the internal audit, significant issues in internal audit reports and responses by management.

- Review and discuss the performance and effectiveness of the internal audit function.

\*       \*       \*

**Legal and Regulatory Compliance.** The Audit Committee shall review and discuss with management, the internal auditors and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with the Foreign Corrupt Practices Act of 1977, and similar anticorruption laws, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs, in each case to the extent pertaining to financial, accounting and/or tax matters, and shall recommend to the Board or the Nominating and Corporate Governance Committee of the Board any changes to the Code of Business Conduct and Ethics or anticorruption policy. The Audit Committee shall discuss with management, the internal auditors and the independent auditor any correspondence with regulators or governmental agencies, and any published reports that raise material issues regarding the Company's financial statements or accounting policies. The Audit Committee shall discuss with the Company's senior legal officer and senior internal audit executive any legal matters that may have a material impact on the financial statements or the Company's compliance procedures that pertain to financial, accounting, investment or tax matters of the Company.

*        *        *

**Risks**. The Audit Committee shall review and discuss with management, the internal auditors and the independent auditor the Company's major risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management pertaining to financial, accounting, tax, legal and cybersecurity matters. The Audit Committee shall also review the Company's risk management framework and programs, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees. With respect to cybersecurity, the Audit Committee shall discuss with management and the independent auditor the adequacy and effectiveness of the Company's policies and practices regarding information technology risk management and the internal controls related to cybersecurity, and shall regularly report its findings to the Board, including any significant issues that arise. If such significant issues arise, the Board shall oversee any mitigation and remediation efforts and any changes to the Company's policies and practices regarding information technology risk management and the internal controls related to cybersecurity.

42.     In violation of the Audit Committee Charter, and their general duties as members

of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the

Company's internal controls or the Company's compliance with legal and regulatory requirements

resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting.  The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false misrepresentations to the SEC, the investing public, and the Company's stockholders.

43.     In addition, as executive officers and directors of a publicly-traded company whose Common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Pluralsight to make false and misleading statements of material fact about the Company's financials and about Pluralsight's maintenance of adequate internal controls.

44.     Each of the Individual Defendants further owed to Pluralsight and its stockholders the duty of loyalty requiring that each favor Pluralsight's interest and that of its stockholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain a personal advantage.

## SUBSTANTIVE ALLEGATIONS

**BACKGROUND**

45.     Founded in 2004 by defendant Skonnard, defendant Onion, Keith Brown, and Bill Williams, the Company has its headquarters in Farmington, Utah.  Since 2011, the Company has

seen rapid growth.  It has been named to the Inc. 5000 list of fastest growing private companies, ranking as the #9 Top Education company and the #19 Top Utah company.  In October 2017, Pluralsight was named #29 on MountainWest Capital Network's Utah 100 list.  In 2017, it ranked #20 on the Forbes Cloud 100 list.  On May 17, 2018, the Company opened on the NASDAQ exchange at a $15 share price and closed its first day of trading at $20.

46.    According to its public filings, Pluralsight is a leading provider of technology skill development solutions committed to closing the global technology skills gap through our cloud-based technology skills platform.  Learners on the Company's platform can quickly acquire today's most valuable technology skills through high-quality learning experiences delivered by subject-matter experts, available on any device at any time.  The Company provides businesses with visibility into the strengths of their workforce, allowing them to better align resources, provide targeted skill development, and advance the skills of their teams.  As of July 2018, the Company uses more than 1,400 subject-matter experts as authors and offers more than 6,500 courses in its catalog.

47.    The Company utilizes a subscription-based business model common referred to as "software as a service" ("SaaS").  Through the SaaS model, the Company licenses its software on a subscription basis and generates substantially all of its revenue from the subscriptions.  The Company maintains a large sales team to sell subscriptions to business and enterprise users.

48.    The Company primarily measures its growth based on a metric called "billings," which is total revenue for a period, plus the change in deferred revenue based on the subscription period.  Throughout the Relevant Period, the Individual Defendants emphasized the importance of billings for the Company.  The Individual Defendants explained in its public filings that billings are used "to measure and monitor our ability to provide our business with the working capital

generated by upfront payments from our customers and our ability to sell subscriptions to our platform to both existing and new customers." Soon after the IPO, the Company sought to expand the sales team to drive up its billings.

**THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS**

49.     During the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (i) Pluralsight was experiencing sales execution challenges which impacted its billings; (ii) Pluralsight was experiencing substantial delays in hiring and properly training its salesforce to meet its optimistic billing projections; and (iii) Pluralsight was behind on the onboarding of new sales representatives which was causing sales execution issues and preventing the Company from meeting its high growth projections. The Individual Defendants intentionally obscured and omitted this information from the public investors.

**A.      2Q2018 Results and the 2Q2018 10-Q**

50.     On August 1, 2018, the Individual Defendants caused the Company to file a Form 10-Q (the "2Q2018 10-Q") disclosing the Company's financial and operational results for the second quarter of 2018. The Company reported billings of $65.3 million, and billings from business customers of $54.6 million. The 2Q2018 10-Q also represented that the Individual Defendants "monitor billings and certain related key business metrics to help us evaluate our business, identify trends affecting our business, formulate business plans, and make strategic decisions."

51.     In addition, the 2Q2018 10-Q included signed certifications by defendants Skonnard and Budge pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which stated:

1.    I have reviewed this Annual Report on Form 10-Q of Pluralsight, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a15(f) and 15d-15(f)) for the registrant and have:

    a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

52.    Defendants Skonnard's and Budge's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Skonnard and Budge failed to disclose the materially adverse information discussed in ¶49.

53.    On a conference call held with investors and analysts held on the same day, defendant Skonnard stated that:

[B]illings from our top 25 customers for the last 12 months increased by approximately 13 times from the billings we generated from those same customers in the year of their initial purchase.  All of this has led to our strong and growing retention rate of 125%.

\*          \*          \*

[M]ajor tech companies . . . will continue to expand [the Company's] reach into the developer community, further monetize on our content production engine and decrease our go-to-market cost over time.

\*          \*          \*

Our land and expand strategy continues to be successful as evidenced by the growing number of customers with large deal sizes.  For example, for the trailing 2 months the number of customers with annual billings greater than $100,000 increased by 84%.

In Q2 our B2B business represented 84% of total billings, up from 78% in Q2 last year.  And our B2B dollar-based retention grew to 125%, up from 120% at the end of Q1 2018.  Our Q2 gross margin was 76%, up from 74%, and we see a clear path to further improving gross margins over the next one to two years.

54.     At a meeting held with analysts and investors on August 29, 2018, the Individual

Defendants echoed the August 1, 2018 call.  Specifically, defendant Budge stated:

> [T[he big top line measure we look at is our business billings that we have.  The
> last 12 months, north of 60% growth in our business billings, over 50% growth for
> the last five quarters.  And we did it again in the second quarter off of a much more
> difficult compare to the second quarter of last year, so really good growth in our
> segment.

55.     Defendant Budge added that all of the Company's sales representatives hired by

the Company between 2016 and 2018 "are starting to become more tenured" and "getting more

productiv[e,]" which makes it needless to "double [the Company's] sales force every single year[,

and] you'll start to see that benefit pay off in the bottom line."

56.     At the same meeting, defendant Skonnard stated "we'll be able to keep attracting

all the talent we need . . .  because we're also listing the Utah brand across the country and even

around the world . . . . And that work is really making a difference. . . . So we're having a lot of

success… importing talent from outside of Utah, especially the talent that's seen bigger scale,

that's done amazing things.  And so we're very proactive about bringing that talent to Utah."

**B.     3Q2018 Results and the 3Q2018 10-Q**

57.     On October 24, 2018, the Individual Defendants caused the Company to file a Form

10-Q (the "3Q2018 10-Q") disclosing the Company's financial and operational results for the third

quarter of 2018.  The Company reported billings of $72.2 million and billings from business

customers of $61.1 million.  The 3Q2018 10-Q also represented that the Individual Defendants

"monitor billings and certain related key business metrics to help us evaluate our business, identify

trends affecting our business, formulate business plans, and make strategic decisions."  The

Individual Defendants further stated, "We use billings from business customers and our percentage

of billings from business customers to measure and monitor our ability to sell subscriptions to our

platform to business customers.  We believe that billings from business customers will be a significant source of future revenue growth and a key factor affecting our long-term performance. We expect our billings from business customers to continue to increase as a percentage of billings over the long term."

58.     In addition, the 3Q2018 10-Q included signed certifications by defendants Skonnard and Budge pursuant to the SOX similar to the certifications included in the 2Q2018 10-Q.  Nevertheless, defendants Skonnard's and Budge's representation that the Company had adequate internal control over financial reporting was materially false and misleading because defendants Skonnard and Budge failed to disclose the materially adverse information discussed in ¶49.

59.     On a conference call held with analysts and investors on October 24, 2018, defendant Skonnard represented:

> We continue to see strong momentum across our business in the third quarter and achieved our sixth consecutive quarter of greater than 50% growth in B2B billings. We continue to invest across our business while demonstrating the inherent levers to profitability in our model.  Gross operating and cash flow margins improved significantly year-over-year.  Our teams continue to execute with strong focus and commitment to customer success, as demonstrated by our dollar-based net retention rate reaching 127%.

60.     Defendant Budge added that the Company's "land and expand strategy continues to be successful as evidenced by the growing number of customers with larger deal sizes.  For the trailing 12 months, the number of customers with annual billings greater than $100,000 increased by 79%" and as "an indicator of our ability to significantly expand in our customer base, billings from our top 25 customers for the last 12 months increased by approximately 18x from the billings we generated from those same customers in the year of their initial purchase.  This has helped lead to our strong and growing retention rate of 127%."  Defendant Budge continued that the

"combination of our acquisition of new customers and our ability to expand within our customer base resulted in a record third quarter for Pluralsight."

### C.    2018 Results and the 2018 10-K

61.    On February 13, 2019, the Individual Defendants caused the Company to publish a press release announcing the Company's financial and operational results for the fourth quarter of 2018 and 2018 annually.  The Individual Defendants reported that the Company's billings for the fourth quarter of 2018 was $100.6 million and billings from business customers was $87.1 million. For 2018 annually, billings were $293.6 million and billings from customers were $248.2 million.

62.    In the press release, defendant Skonnard stated that "Pluralsight's fourth quarter capped off a milestone year for the company, highlighted by strong customer additions and 42% revenue growth.  We achieved our seventh consecutive quarter of greater than 50% growth in B2B billings, while continuing to demonstrate the inherent levers to profitability in our model."

63.    On a conference call with investors and analysts held on February 13, 2019, defendant Skonnard, in a prepared remark, stated that the Company "achieved our seventh consecutive quarter of greater than 50% growth in B2B billings, while continuing to demonstrate the inherent levers to profitability in our model by exiting the year with positive free cash flow in Q4 as we committed to deliver when we went public last May."

64.    Defendant Skonnard continued:

As an indicator of our ability to significantly expand on our customer base, billings from our top 25 customers for the last 12 months increased by approximately 20 times from the billings we generated from those same customers in the year of their initial purchase.  This has helped lead to our strong and growing dollar-based net retention rate of 128%.

In addition to expansion, we also saw strong performance in net new business during the quarter, as demonstrated by over 570 new business customer wins.  These included a Fortune 50 multinational aerospace corporation, a Fortune 500 industrial supply corporation, one of the world's largest multinational banks, a Fortune 100 airline and the national law enforcement agency of a major European country. These new customer

wins demonstrate that our platform works for any industry at scale. The combination of our acquisition of new customers and our ability to expand within our customer base resulted in a record quarter for Pluralsight.

65.     As to the sales force of the Company, defendant Budge stated, "[t]otal quota-bearing reps closing in around 240, we expect that to grow to probably over 300 as we roll through 2019. So definitely when we think about where our investment, . . . go-to-market and product are by far the 2 biggest areas where we're investing in 2019, similar to what we did in 2018. So more reps to come, more on quota on the street and more goodness from them."

66.     On February 21, 2019, the Individual Defendants caused the Company to file a Form 10-K (the "2018 10-K") reporting the Company's financial and operational results for the fourth quarter of 2018 and 2018 annually. The 2018 10-K stated:

> We have achieved significant growth in recent periods. For the years ended December 31, 2018, 2017, and 2016, our billings totaled $293.6 million, $205.8 million, and $149.2 million, representing year-over-year growth of 43%, 38%, and 15%, respectively. Our billings from business customers for the same periods were $248.2 million, $163.0 million, and $104.9 million, respectively, representing year-over-year growth of 52%, 55%, and 25%. Our net loss for the years ended December 31, 2018, 2017, and 2016, was $128.6 million, $96.5 million, and $20.6 million, respectively, which reflects our substantial investments in the future growth of our business.

>                          *        *        *

> We utilize a land-and-expand strategy within businesses, beginning with either individual users or departmental deployments. Our platform is used by individuals, developer groups, IT departments, line of business users, and human resources. Historically we have expanded from small teams to departments to business-wide deployments of our platform. For example, from 2013 to 2018, the billings from our business customers that were included in the 2018 Fortune 500 list, including new 2018 Fortune 500 customers that we acquired after 2013, increased by 18.1 times in the aggregate from the billings from those same companies in 2013. We intend to drive increased sales to existing customers by targeting new users, departments, and geographies within our customers.

>                          *        *        *

> We have a large direct sales force to focus on business sales and have aligned our sales team's compensation structure to fit this objective. We have also been able

to drive substantial increases in the productivity and effectiveness of our sales personnel over time as they gain more experience selling subscriptions to our platform.   We intend to pursue a greater proportion of large scale, recurring business transactions and to more effectively drive business customer engagement throughout the life of the relationship.   As an example of our ability to increase customer engagement, as of December 31, 2018, our 25 largest customers had expanded their annual spend by 19.6 times the amount they spent in the year of initial purchase.   We will continue to expand our platform capabilities to deliver additional value to our customers.   Our sales force educates business customers on the strengths of our platform to help customers make informed decisions and create a customized and unified end-to-end learning experience for their businesses.

*      *      *

We monitor business customers, billings, and certain related key business metrics to help us evaluate our business, identify trends affecting our business, formulate business plans, and make strategic decisions.

*      *      *

We use billings from business customers and our percentage of billings from business customers to measure and monitor our ability to sell subscriptions to our platform to business customers.   We believe that billings from business customers will be a significant source of future revenue growth and a key factor affecting our long-term performance.   We expect our billings from business customers to continue to increase as a percentage of billings over the long term.

67.     In addition, the 2018 10-K included signed certifications by defendants Skonnard and Budge pursuant to the SOX similar to the certifications included in the 2Q2018 10-Q. Nevertheless, defendants Skonnard's and Budge's representation that the Company had adequate internal control over financial reporting was materially false and misleading because defendants Skonnard and Budge failed to disclose the materially adverse information discussed in ¶49.

**D.     The SPO**

68.     On March 4, 2019, the Individual Defendants caused the Company to file a Form S-1 (along with a prospectus filed on March 7, 2019, the "SPO Registration Statement").   Through the SPO, certain of the Individual Defendants sought to sell 13,558,464 shares of Pluralsight stock

for $29.25 per share along with granting the underwriters a 30-day option to purchase up to an additional 2,033,770 shares.

69.     In the SPO Registration Statement, the Individual Defendants stated:

For year ended December 31, 2018, 85% of our billings came from business customers and 15% came from individual users.  Customers subscribe to our platform unassisted through our website or through our direct sales channel.  We make adoption easy, with free-trials and transparent pricing for all of our features.

\*          \*          \*

We have significantly expanded our direct sales force to focus on business sales and have aligned our sales team's compensation structure to fit this objective.  We intend to pursue a greater proportion of large scale, recurring business transactions and to more effectively drive business customer engagement throughout the life of the relationship.

\*          \*          \*

We have a large direct sales force to focus on business sales and have aligned our sales team's compensation structure to fit this objective.  We have also been able to drive substantial increases in the productivity and effectiveness of our sales personnel over time as they gain more experience selling subscriptions to our platform.  We intend to pursue a greater proportion of large scale, recurring business transactions and to more effectively drive business customer engagement throughout the life of the relationship.

\*          \*          \*

We use billings from business customers and our percentage of billings from business customers to measure and monitor our ability to sell subscriptions to our platform to business customers.  We believe that billings from business customers will be a significant source of future revenue growth and a key factor affecting our long-term performance.  We expect our billings from business customers to continue to increase as a percentage of billings over the long term.

70.     The SPO's total proceeds were over $450 million.  Defendants Skonnard, Budge, Duncan, Dorsey, Onion, and Rencher collectively sold 1,778,464 shares for total proceeds of over $50 million in connection with the SPO.

**E.     1Q2019 Results and the 1Q2019 10-Q**

71.     On May 1, 2019, the Individual Defendants caused the Company to file a Form 10-Q (the "1Q2019 10-Q") reporting the Company's financial and operational results for the first quarter of 2019, including billings of $77.9 million for the quarter.  In the 1Q2019 10-Q, the Individual Defendants represented, "We monitor billings and certain related key business metrics to help us evaluate our business, identify trends affecting our business, formulate business plans, and make strategic decisions. . . . We believe that billings from business customers will be a significant source of future revenue growth and a key factor affecting our long-term performance. We expect our billings from business customers to continue to increase as a percentage of billings over the long term."

72.     In addition, the 1Q2019 10-Q included signed certifications by defendants Skonnard and Budge pursuant to the SOX similar to the certifications included in the 2018 10-K. Nevertheless, defendants Skonnard's and Budge's representation that the Company had adequate internal control over financial reporting was materially false and misleading because defendants Skonnard and Budge failed to disclose the materially adverse information discussed in ¶49.

73.     In connection with the Company's results for the first quarter of 2019, the Individual Defendants published a press release, in which defendant Skonnard stated, "Our Q1 financial results marked a great start to 2019.  Revenue and billings growth continue to be strong with both up over 40% year-over-year.  We continue to demonstrate the efficiency in our model with our third consecutive quarter of positive cash flow."

74.     Further, on a conference call held with analysts and investors on May 1, 2019, defendant Budge stated:

> [T]here's probably only so many reps we could hire in any given year.  We do have
> a pace to it that between our people team and our sales management teams that puts

people through good rigor on the kind of reps that we would like to hire into our organization.  And we like the direction we're going on both a top and bottom line.

75.   On the same call, defendant Skonnard stated:

Revenue and billings growth continue to be strong with both up over 40% year-over-year.  We continued to demonstrate the efficiency in our model with our third consecutive quarter of positive cash flow.  And our teams continue to execute with strong focus and commitment to customer success as demonstrated by our dollar-based net retention rate of 128%.

\*        \*        \*

[W]e're still committed, and we see a clear path to having 300-plus reps by the time we exit the year.  So the short answer is we're on pace.

\*        \*        \*

[W]e'll incentivize our sales forces to create that experience for the customer and bring ultimately more billings into Pluralsight.

\*        \*        \*

[W]e like where we are with our sales reps.  We're committed to continue to grow the sales force.  We have a plan to grow into the high 200s, even cross over 300s in quota-bearing reps this year, 2019, which continues on the really outstanding progression we've had over the last few years where we've massively expanded our sales force from 80 quota-bearing reps two years ago to at the end of this year over 300.  So a lot of growth there.

76.   On June 17, 2019, however, the Company filed a Form 8-K with the SEC announcing that the 2018 10-K materially understated the Company's net losses, which was due to incorrect recognition of certain expenses beginning with the Company's second quarter of 2018. The restatement increased 2018 sales and marketing expenses by over $4.7 million.  The Individual Defendants sought to reassure investors by representing that the adjustments did not affect "key business metrics" such as billings.  Pluralsight also reaffirmed both its second quarter of 2019 and fiscal year 2019 guidance.

77.     The above statements in ¶¶ 50-76 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Defendants failed to disclose that:  (i) Pluralsight was experiencing sales execution challenges which impacted its billings; (ii) Pluralsight was experiencing substantial delays in hiring and properly training its salesforce to meet its lofty billing projections; and (iii) Pluralsight was behind on the onboarding of new sales representatives which was causing sales execution issues and preventing the Company from meeting its high growth projections.  As a result of the foregoing, Defendants' public statements were materially false and/or misleading and/or lacked a reasonable basis.

## THE TRUTH IS REVEALED

78.     On July 31, 2019, the Individual Defendants disclosed that its billings growth had sharply deteriorated from over 40% to just 23% year-over-year.  In a related conference call with analysts and investors held on the same day, defendant Skonnard blamed "sales execution challenges, which impacted our billings."  Defendant Skonnard also disclosed that the Company "hired over 100 new sales reps in the last 12 months, which may seem like a lot, but that was not enough capacity in the system to sustain our high growth expectations as we entered the year.  In addition, the type of fast growth we've enjoyed requires us to provide prescriptive and effective sales enablement, and we didn't invest enough in that area of our business."

79.     On the same call, defendant Budge added that "[s]imply put, . . . there were dozens of reps that we needed to bring on board at the end of last year, beginning into this year, so they would ramp and become fully productive in the second quarter.  And there [were] for a number of reasons delays in bringing them on board until, . . . early to mid-second quarter."  Notably, this statement shows that the Company was aware of the hiring delays at the time of the SPO.

80.     The Individual Defendants also disclosed that its Chief Revenue Officer was resigning.

81.     On August 1, 2019, an analyst with Barclays dropped the Company's stock price target from $41.00 to $26.00.  The Barclays analyst stated that "[m]anagement will be in the penalty box after reiterating guidance" in the June 17, 2019 8-K, which was filed "with only two weeks left in the quarter."

82.     Other securities analysts at various institutions also dropped the Company's stock price target.  SunTrust dropped the target from $41.00 to $27.00, pointing "the magnitude of the billings weakness."  Likewise, Raymond James lowered the target to $26.00 pointing "the magnitude of the ~17 point deceleration in billings."

83.     On this news, Pluralsight's stock price nosedived to 40%, or $12.13 per share to $18.56 on August 1, 2019.  The Company's stock price continued downward the next two trading days, closing at $17.64 per share on August 5, 2019.

**THE DIRECTOR DEFENDANTS ISSUED A MATERIALLY FALSE AND MISLEADING PROXY STATEMENT DURING THE RELEVANT PERIOD.**

84.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Director Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Period.  The Director Defendants drafted, approved, reviewed, and/or signed a Form DEF14A before they were filed with the SEC and disseminated to Pluralsight's stockholders on March 14, 2019 (the "2019 Proxy").  The Director Defendants negligently issued materially misleading statements in the 2019 Proxy.  These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon

any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

85.     The 2019 Proxy sought stockholder votes to, among others, elect defendants Crittenden, Maudlin, and Rencher for a three-year term.

86.     In support the Director Defendants' bid to reelect defendants Crittenden, Maudlin, and Rencher, the Director Defendants highlighted their supposed oversight of the Company.  In particular, the 2019 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Pluralsight faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2019 Proxy stated:

**Role of Board in Risk Oversight Process**

Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, legal and compliance, and reputational.  We have designed and implemented processes to manage risk in our operations.  Management is responsible for the day-to-day management of risks the company faces, while our board of directors, as a whole and assisted by its committees, has responsibility for the oversight of risk management.  Our board of directors reviews strategic and operational risk in the context of discussions, question and answer sessions, and reports from the management team at each regular board meeting, receives reports on all significant committee activities at each regular board meeting, and evaluates the risks inherent in significant transactions.  Our audit committee assists our board of directors in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting and disclosure controls and procedures, legal and regulatory compliance, and also, among other things, discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management.  Our nominating and corporate governance committee assists our board of directors in fulfilling its oversight responsibilities with respect to risks relating to our corporate governance practices, the independence of the board of directors and potential conflicts of interest.  Our compensation committee assesses risks relating to our executive compensation plans and arrangements, and whether our compensation policies and programs have the potential to encourage excessive risk taking.

Our board of directors believes its current leadership structure supports the risk oversight function of the board.  In particular, our board believes that our lead independent director and majority of independent directors provide a well-

functioning and effective balance to the member of executive management on our board.

\*     \*     \*

*Audit Committee*

Our audit committee currently consists of Mr. Maudlin, Mr. Hinkle, and Ms. Terrell, with Mr. Maudlin serving as chairperson.  Mr. Maudlin is considered an "audit committee financial expert" as defined in Item 407(d)(5) of Regulation S-K promulgated under the Securities Act and all members of the audit committee are financially literate.

Our audit committee oversees our corporate accounting and financial reporting process and assists our board of directors in monitoring our financial systems and our legal and regulatory compliance.  Our audit committee also:

- oversees the work of our independent registered public accounting firm ("independent auditors") and our internal control functions;
- oversees the work of our independent registered public accounting firm ("independent auditors") and our internal control functions;
- approves engagements of the independent auditors to render any audit or permissible non-audit services;
- reviews the qualifications, independence and performance of our independent auditors;
- reviews the scope of the annual audit;
- reviews our financial statements and reviews our critical accounting policies and estimates;
- reviews the adequacy and effectiveness of our internal controls;
- reviews and discusses with management and our independent auditors the results of our annual audit and our quarterly financial statements;
- reviews our risk assessment and risk management processes, including cybersecurity matters;
- establishes procedures for receiving, retaining and investigating complaints received by us regarding accounting, internal accounting controls or audit matters; and
- reviews and approves related party transactions under Item 404 of Regulation S-K.

\*     \*     \*

## AUDIT COMMITTEE REPORT

Pluralsight's management is responsible for (i) establishing and maintaining internal controls and (ii) preparing Pluralsight's consolidated financial statements.

Pluralsight's independent registered public accounting firm, PwC, is responsible for performing an independent audit of Pluralsight's consolidated financial statements in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States) (the "PCAOB"), and to issue a report thereon. It is the responsibility of the audit committee to oversee these activities. It is not the responsibility of the audit committee to prepare Pluralsight's financial statements. These are the fundamental responsibilities of management. In the performance of its oversight function, the audit committee has:

- reviewed and discussed the audited financial statements for fiscal year 2018 with the management of Pluralsight and PwC;
- discussed with PwC the matters required to be discussed by Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the PCAOB; and
- received the written disclosures and the letter from PwC as required by applicable requirements of the PCAOB regarding the independent registered public accounting firm's communications with the audit committee concerning independence, and has discussed with PwC that firm's independence.

Based on the audit committee's review of the audited financial statements and the various discussions with management and PwC, the audit committee recommended to the board of directors that the audited financial statements be included in our annual report on Form 10-K for the fiscal year ended December 31, 2018 for filing with the SEC. The audit committee has also appointed PwC as the company's independent registered public accounting firm for the year ending December 31, 2019.

87.     The 2019 Proxy, thus, assured stockholders that both the Individual Defendants and the Board was involved with Pluralsight's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose to investors that: (i) Pluralsight was experiencing sales execution challenges which impacted its billings; (ii) Pluralsight was experiencing substantial delays in hiring and properly training its salesforce to meet its optimistic billing projections; and (iii) Pluralsight was behind on

the onboarding of new sales representatives which was causing sales execution issues and preventing the Company from meeting its high growth projections.

88.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Crittenden, Maudlin, and Rencher.

**THE INSIDER SELLING DEFENDANTS SOLD SUBSTANTIAL SHARES OF PLURALSIGHT STOCK WHILE IN POSSESSION OF MATERIAL, ADVERSE, INFORMATION REGARDING THE COMPANY'S BUSINESS**

89.     During the Relevant Period, certain of the Individual Defendants—specifically, the Insider Selling Defendants—engaged in numerous sales of Pluralsight common stock while in possession of material information that was adverse to Pluralsight's business.

90.     While the price of Pluralsight stock was artificially inflated and defendant Skonnard was in possession of material, adverse nonpublic information, he sold 764,013 shares of personally held Pluralsight stock for proceeds of $24,414,102.

91.     While the price of Pluralsight stock was artificially inflated and defendant Budge was in possession of material, adverse nonpublic information, he sold 518,974 shares of personally held Pluralsight stock for proceeds of $15,097,312.

92.     While the price of Pluralsight stock was artificially inflated and defendant Terrell was in possession of material, adverse nonpublic information, she sold 123,609 shares of personally held Pluralsight stock for proceeds of $2,457,346.

93.     While the price of Pluralsight stock was artificially inflated and defendant Rencher was in possession of material, adverse nonpublic information, he sold 42,500 shares of personally held Pluralsight stock for proceeds of $1,205,831.

94.     While the price of Pluralsight stock was artificially inflated and defendant Duncan was in possession of material, adverse nonpublic information, he sold 30,000 shares of personally held Pluralsight stock for proceeds of $851,175.

95.     While the price of Pluralsight stock was artificially inflated and defendant Onion was in possession of material, adverse nonpublic information, he sold 1,417,600 shares of personally held Pluralsight stock for proceeds of $38,533,965.

96.     In making the insider trades, the Insider Selling Defendants were able to unjustly profit from artificially high trading levels stemming from the Individual Defendants' concerted false and misleading statements disseminated to the market.

## DAMAGES TO THE COMPANY

97.     As a result of the Individual Defendants' wrongful conduct, Pluralsight disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Pluralsight's credibility.  Pluralsight has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

98.     Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action.

99.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Pluralsight's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

100.    Moreover, these actions have irreparably damaged Pluralsight's corporate image and goodwill.  For at least the foreseeable future, Pluralsight will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Pluralsight's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

101.    Plaintiff incorporates the allegations herein by reference.

102.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

103.    Plaintiff is a stockholder of Pluralsight, was a stockholder of Pluralsight at the time of the wrongdoing alleged herein, and has been a stockholder of Pluralsight continuously since that time.

104.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

105.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Pluralsight Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

106.    At the time of the filing of this complaint, the Pluralsight Board consists of the following eleven individuals:  defendants Skonnard, Duncan, Stewart, Rencher, Onion, Crittenden, Terrell, Johnson, Hinkle, Dorsey, and Maudlin.

107.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Pluralsight Board to institute this action against the Individual Defendants.  Such a demand would have been a futile and useless act with respect to each and every one of the current members of the Board because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

108.    The Individual Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

109.    Moreover, as directors, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or recklessly allowed, made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Individual Defendants face a substantial likelihood of liability.  If the Individual Defendants were to bring a suit on behalf of Pluralsight to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Individual Defendants.

110.    Further, defendant Skonnard is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.  Additionally, defendant Skonnard is not independent because his principal source of income comes from his employment with Pluralsight.  In 2018 alone, defendant Skonnard received $12,951,975 from the Company in compensation.

111.    Additionally, the 2019 Proxy explicitly admits that defendants Skonnard, Onion, and Duncan are not independent.

**DEMAND IS EXCUSED AS TO THE AUDIT COMMITTEE DEFENDANTS BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

112.    As members of the Audit Committee during the Relevant Period, the Audit Committee Defendants participated in and knowingly approved filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to oversee and monitor (a) the integrity of the Company's financial statements, and (b) the Company's compliance with legal and regulatory requirements. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and compliance with legal and regulatory requirements, as required by the Audit Committee Charter.  For this reason, demand is futile as to the Audit Committee Defendants.

## COUNT I
### VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT
#### (Against the Director Defendants)

113.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

115.     The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2019 Proxy.  In the 2019 Proxy, the Board solicited stockholder votes to reelect certain of the Director Defendants to the Board.

116.     The 2019 Proxy, however, misrepresented and failed to disclose, among others, the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior described herein.  By reasons of the conduct alleged herein, the Individual Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Pluralsight misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants to the Board.

117.     Plaintiff, on behalf of Pluralsight, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2019 Proxy in connection with the improper reelection of the Director Defendants to the Board.

## COUNT II
### BREACH OF FIDUCIARY DUTY
**(Against the Individual Defendants)**

118.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

119.    Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Pluralsight's business and affairs.

120.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

121.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Pluralsight.

122.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

123.    In addition, the Individual Defendants further breached their fiduciary duties owed to Pluralsight by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and failing to disclose to investors that:  (i) Pluralsight was experiencing sales execution challenges which impacted its billings; (ii) Pluralsight was experiencing substantial delays in hiring and properly training its salesforce to meet its optimistic billing projections; and (iii) Pluralsight was behind on the onboarding of new sales representatives which was causing sales execution issues and preventing the Company from meeting its high growth projections.

124.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

125.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

126.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

127.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

128.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Pluralsight has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

129.    Plaintiff on behalf of Pluralsight has no adequate remedy at law.

## COUNT III
### WASTE OF CORPORATE ASSETS
**(Against Individual Defendants)**

130.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.    As a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, Pluralsight is subject to the Securities Class Action.  The Individual Defendants have caused Pluralsight to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

132.    As a result of this waste of corporate assets, the Company has been damaged and the Individual Defendants are each liable to the Company.

## COUNT IV
### INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION
**(Against the Insider Selling Defendants)**

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    At the time each of the Insider Selling Defendants sold his or her Pluralsight stock, he or she knew the material, non-public information described above, and sold Pluralsight stock on the basis of such information.

135.    The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in Pluralsight stock.  Each of the Insider Selling Defendants knew that this information was not intended to be

available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Pluralsight stock.

136.   The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith.  Each of the Insider Selling Defendants is therefore liable to Pluralsight for insider trading.

137.   Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

138.   Plaintiff, on behalf of Pluralsight, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Pluralsight and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.     Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 12, 2020

Respectfully Submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange St., Suite 1120
Wilmington, DE 19801
(302) 984-3800
*Attorney for Plaintiff*

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Garam Choe
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 355-4648